# Hydraulic Press Brick Company v. Commissioners of Hospital of the City of Louisville, et al.

## A. Bentley & Sons Company v. Same.

(Decided June 11, 1915.)

### Appeals from Jefferson Circuit Court (Chancery Division, No. 1).

Contracts—Novation—Evidence.—A general contractor contracted with the hospital commission to furnish all the labor and material for the construction of a hospital, with the exception of face brick, which the commission agreed to furnish at certain prices. The commission accepted the bid of another contractor for the brick, The general contractor sued the commission for damages for failure to deliver the brick promptly. The brick contractor sued for a balance due for brick. The commission defended on the ground that the brick contract had been assumed by the general contractor with the consent of the brick contractor and that this constituted a novation. Evidence considered and held sufficient to sustain the defense.

TRABUE, DOOLAN & COX and BLAKEY, QUIN and LEWIS for appellants.

J. W. S. CLEMENTS and PENDLETON BECKLEY for appellees.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Affirming.

These two appeals involve the same questions and will be considered in one opinion.

The Hospital Commission was organized by an act of the General Assembly, approved March 14th, 1910, to build a new city hospital in Louisville with the proceeds of a $1,000,000.00 bond issue which the city was authorized to vote. The bonds having been voted and disposed of, the commission advertised for bids for the construction of the hospital. The specifications provided that the successful contractor should furnish all material and labor, except face brick for exterior walls and for certain interior walls, which the commission was to deliver to the contractor at the price of $20.00 per thousand and $24.00 per thousand, respectively.

The contract for the construction of the hospital was awarded to the A. Bentley & Sons Company, a corporation. The contract provided that the commission agreed

to provide all labor and material not included in the contract in such a manner as not to materially delay the progress of the work, and to indemnify the contractor for any loss occasioned by its failure so to do.

On February 15th, 1912, Owen Tyler was awarded the contract for supplying the face brick at $17.50 per thousand. The price was afterwards changed to $19.00 per thousand, conditioned on delivery of the brick at the hospital site. By supplemental contracts of February 23rd, and February 29th, 1912, the commission contracted with Tyler for fancy shaped and special brick to be delivered at the hospital. Tyler purchased the brick from the Hydraulic Press Brick Company and assigned his claim for the unpaid price of the brick to that company. The brick were furnished, and at the institution of this action there was due, under the contract, a balance of $5,177.40.

After the completion of the hospital the Hydraulic Press Brick Company and Tyler brought suit against the Hospital Commission to recover the above balance.

The A. Bentley & Sons Company also brought suit against the commission for $5,000.00 damages, alleged to have resulted from the failure of the commission to promptly furnish them the brick which it had agreed to furnish.

The two actions were subsequently consolidated, and on final hearing the chancellor held that the contract between the commission and Tyler had been subsequently assumed by Bentley with the consent of Tyler, and that the commission was not liable to either of the plaintiffs.

It will be seen that the question presented is one of novation. To substantiate its claim of novation the commission relies on the following evidence: Mr. Murphy, the architect, says that he discussed the method of carrying out the brick contract with Mr. Bentley, who suggested that it would be better for his concern to handle the brick matter themselves. Thereupon he and Mr. Maher, Mr. Bentley's superintendent in charge of the work of construction, went before the commission, and Mr. Murphy suggested to the commission, in the presence of Mr. Maher, that it would be better to turn the brick contract over to Bentley. Judge Peter, a member of the commission, testifies that Mr. Murphy, the architect, and Mr. Maher, representing Bentley & Sons Company, appeared before the commission and stated

that it was best that Bentley & Sons Company make the contract for the delivery of the brick instead of the commission, as in that way the matter could be better handled. The minutes of the meeting at which this occurred show the following:

"Mr. Murphy and Mr. Maher state that the contract for brick would be made between Mr. Owen Tyler and the A. Bentley & Sons Company. At this point Mr. Maher withdrew; on motion of Mr. Hubbuch and seconded by Judge Peter, it was agreed to turn over the brick contract to Messrs. A. Bentley & Sons Company at $19.00 per thousand delivered at the hospital site. This was carried unanimously."

After the meeting of the commission at which Tyler was awarded the contract, Tyler wrote A. Bentley & Sons Company, notifying them of the fact that his brick had been selected, and stating, in substance, that he had been advised that they would need brick within the next three weeks and that he would be pleased to have their formal order as to quantities, etc.

On February 19th, 1912, A Bentley & Sons Company wrote Tyler a letter congratulating him on his success, and containing the following:

"We have written the architects requesting them to send us the necessary instructions for dealing direct with you in this matter. As soon as we receive this, we will send you a letter giving you the deliveries as near as we can determine them at this time."

On February 29th, 1912, Murphy, the architect, wrote the following letter to the A. Bentley & Sons Company:

"The commissioners of hospital directed us to advise you to accept the bid of Owen Tyler for No. 601 shade of brick, according to sample in office of the commission, for the outside of the Louisville Public Hospital building at the rate of Nineteen ($19.00) Dollars per thousand delivered at the building.

"No. 601 Octagon at Fifty ($50.00) Dollars per thousand delivered at the building.

"For the interior work, No. 601 selected repressed brick at the rate of Twenty-one ($21.00) Dollars per thousand delivered at the building.

"No. 601 Bull Nose at the rate of Fifty ($50.00) Dollars per thousand delivered at the building.

"No. 601 internal round corner brick at the rate of Sixty-five ($65.00) Dollars per thousand delivered at the building.

"The Bull Nose and the internal round corner brick to be out to a radius of 1½ inches."

On October 3rd, 1912, A Bentley & Sons Company sent Owen Tyler the following telegram:

"Maher reports out of face brick again. This is a very serious damage to us, as we have had to lay off the entire force of bricklayers. Expect to hold you responsible."

On January 25th, 1913, the Hydraulic Press Brick Company, through its sales manager, E. Hervey, wrote the A. Bentley & Sons Company as follows:

"In regard to the balance due for the brick furnished for the above building, while the account was handled through Owen Tyler, as our agent, and your order was placed with him, this is in reality a transaction with this company, and we will direct and handle the matter. So far as any claim you may feel you have against the hospital commission or ourselves we can say that we will not entertain any allowance for any amount whatever. The hospital commission selected our material and directed you to buy it. We have no time contract either express or understood, with the commission or yourselves.

"Our account is with your firm and whatever claims you may care to make against the commission has no bearing upon our legal rights."

On February 14th, 1913, a meeting of the commission was held to adjust the brick controversy. Mr. Bentley was present and claimed damages for delay in the delivery of the brick. Mr. Hervey, the sales manager of the Hydraulic Press Brick Company, was also present. Judge Peter explained that the commissioners had only selected the bricks and the making of the contract for their delivery, and everything else connected therewith had been turned over to Mr. Bentley; that throughout the building of the hospital the commissioners had no dealing with any of the brick people, but that all of their payments had been made to Messrs. A. Bentley & Sons Company. Mr. Hervey, the sales manager, stated that that was exactly the position of his company.

On the other hand, plaintiffs rely on the following testimony: Bentley testifies, in substance, that Murphy

suggested that it would save annoyance and confusion if his company would draw the full amount of money due and pay the brick supply men. He replied that anything that suited Murphy would suit him. At the same time the matter of hauling was discussed. Murphy wanted Bentley to pay for the hauling. This Bentley declined to do. At the same time Bentley suggested that he was in a better position to get good hauling prices, and further suggested that Maher go before the commission and tell the commission what the brick could be hauled for. Bentley further explains that this was done merely for the accommodation of Murphy and in order to expedite matters and with no thought of releasing the commission from its contract. Tyler was not present when the commission directed the turning over of the brick contract to Bentley and was not apprised of its action. However, Mr. Tyler testified that after the making of the contract he looked to A. Bentley & Sons for payment and did receive all payments from them. When the award was made he was under the impression that the commission was to pay for the brick.

From the foregoing it will be seen that the following facts clearly appear: The A. Bentley & Sons Company was the general contractor. The commission agreed to deliver it face brick at certain specified prices. To this end it advertised for bids. Owen Tyler was the accepted bidder. The general contractor preferred to handle the brick matter direct. The commission's architect and Mr. Maher, the A. Bentley & Sons Company's superintendent, who had sole charge of its work, went before the commission and stated that the contract for brick would be made between Mr. Owen Tyler and the A. Bentley & Sons Company. Thereupon the commission made an order turning over the contract to that company. Here then the A. Bentley & Sons Company expressly consented to the new arrangement. While it is true that Tyler was not present, his subsequent conduct shows that he, too, acquiesced in the arrangement. From that time on practically all of the negotiations with reference to the delivery of the brick and the payment therefor were carried on directly between the A. Bentley & Sons Company and Tyler. Not only so, but all payments were made by the A. Bentley & Sons Company. When the matter of damages for delay in the delivery of brick came before the commission, we find the sales

manager of the Hydraulic Press Brick Company taking the position that everything connected with the contract had been turned over to the A. Bentley & Sons Company. We further find the same officer claiming, in a letter of January 25th, 1913, that the Hospital Commission selected his company's material and directed A. Bentley & Sons Company to buy it, and that his company's account was with the A. Bentley & Sons Company. In the fall of 1912, the A. Bentley & Sons Company telegraphed Tyler that they were out of brick and notified him that they expected to hold him responsible.

In our opinion, the foregoing facts and circumstances are sufficient to make out a case of novation and the chancellor properly so held.

Judgment affirmed.